Good morning. Craig Stewart for the appellants, and I'd like to reserve two minutes for rebuttal. The district court judgment should be reversed here because the court committed two fundamental errors. First, it concluded that diagnostic labs had alleged only a scheme that lasted no more than 10 months. And second, it ruled that 10 months of repeated conduct is not enough to constitute a pattern. The first of these rulings violated the standard that governs Rule 12b-6 motions. And the second of these rulings is directly contrary to governing RICO standards as pronounced by the Supreme Court and by this Court. As both of the courts have recognized, RICO is to be construed broadly because of its consciously expansive language and because Congress explicitly directed that it be liberally construed to effectuate its remedial purposes. And the district court's order here is fundamentally inconsistent with these standards. I'd first like to address the court's ruling that the scheme here was limited to only 10 months. Ten months was only the period involving the initial victimization of diagnostic labs, First Choice, and Shriver. But that was not all that we've alleged here, and that's not all that was at issue here. You're adding on the acts after? Yes. After 2012, which the district court disregarded. After 2012, Paulson, one of the defendants, testified that he believed Robert Seward, whom North America had hired away from diagnostic labs, had done a good job in what he'd done in 2012. And they wanted him to continue doing that good job. And Seward himself testified that he was hired to go after all of them, or I mean at least most of them, a lot of them, meaning the vendors, to do to other vendors what had happened to diagnostic labs. Is there anything in the evidence that shows that new vendors were targeted in 1912? Yes. The 2012, excuse me. In 2012, they went after the oxygen vendors after they terminated the x-ray and lab vendors. In 2013, they went after the pharmacy vendors. And that continued, according to their own testimony, as late as June 2014. And then Paulson testified that he asked Seward to look at the food vendors. That was as of June 2014. So it wasn't limited to just 2012. It extended at least into 2014, middle of 2014, by their own admission. Now, the defendants say, well, there's no evidence that there was fraud committed against these later vendors. Now, if the defendants want to argue at trial that Bobby Seward and the defendants changed their stripes and stopped engaging in the conduct, even though Paulson testified that he thought Seward was doing a good job and they wanted him to continue it, they're free to make that argument at trial. But we're here on a 12B6 motion on the pleadings. And there's internal documents that substantiate that they didn't change their stripes all of a sudden at the end of 2012 when they were going after the other vendors in 2013 and 2014. Their internal emails reflect their position that a vendor simply adhering to the terms of the contract was, quote, overcharging. And they advocated terminating vendors because they wanted to stick to the terms of their contracts. So I believe the contract was the vendors wanted to stick to the terms of the contract. That's what you mean? That's what I meant. I'm sorry. Yes. Okay. That's right. That's what I meant. So just looking at the what we call the fraud predicates, they continued, by our allegations and by their own admissions, well into 2014. And then, of course, that's not all we allege. We also have the non-fraud predicates, the obstruction, the extortion. That also continued into 2013 and 2014, and indeed as late as 2016. Well, opposing counsel seem to say the emails do not seem to demonstrate that the communications were part of the execution of or incident to an essential part of the 2012 scheme. What is your response to that? I think what they're saying is these were only internal emails. They were not actually sent to the vendors. But the point is that the emails reflect an intent behind the scheme. They reflect the position of the defendants in North America to go after vendors, not on the ground that they were overcharging in the correct sense of that word, but only in the sense that they were adhering to the terms of their contract. I mean, part of what's going on here is there's the district court and the defendants are compartmentalizing improperly the various allegations and ignoring the overall scheme. On the extortion, for example, they say, well, this was ordinary business conduct to offer up a confidentiality clause. But it was when you look at the overall scheme, including the threats that were made explicitly, I'm thinking now of the May 22nd, 2014 letter, in which they explicitly threatened diagnostic labs if they didn't cave in and drop their litigation, this is the obstruction and the extortion, that Sorenson would be going to a conference with owners and operators of skilled nursing facilities to badmouth diagnostic labs and to, in their words, reveal the massive and fraudulent overbilling that they claimed diagnostic labs had been involved in. So if the time period isn't artificially truncated, I don't think there's any question that we have more than enough. We have four or five years of predicate acts, which is more than enough to constitute closed-ended continuity. And on that basis alone, the judgment has to be reversed without even reaching the other tests. But there's also open-ended continuity when the allegations aren't artificially truncated, because we have evidence that this was a regular way of doing business, that they were going after vendors in a serial fashion. There were 40 to 50 vendors that they had, and we know that it was X-ray and labs, then it was oxygen, then it was pharmacy, then they were going after food. This was a regular way of business, at least as much as in the Tycor case of this court, where there were three predicate acts over a period of 13 months. And the court found that was enough to constitute open-ended continuity. Or the Sun Savings case, where there were four predicate acts over just a couple of months. Counsel, I have a question, if I could, quickly, and your time's ticking. So your briefing talks a lot about the tally and the fact that there's a notation at the bottom of it to the effect of this is what you owe us thus far. And you argue that in your briefing that that should be understood to mean that they were going to go after additional vendors. Do you ever argue that it should be understood as a threat, that if you don't pay this much, we're going to go after you, but start looking retrospectively at the earlier billing? Oh, I don't know that we're making that condition, Your Honor, because I believe that was just an internal spreadsheet. And so it wasn't actually used against our client as a threat to our client. But certainly, you know, there's no reason, I guess, to read to look at that only as a perspective. But did you ever make the argument? I don't know that we did, Your Honor. All right. In just the last couple of seconds before I don't want to do on reserve my time. But even if, you know, as explained in our brief, even if the time period is only 10 months, under California architectural, that is enough. And under all waste, which rejected any Brightline rule in this circuit, that 10-month period was enough, in part because of the multiple victims within that 10-month period and the variety of predicate acts that were committed in that period. And I'll reserve the remainder of my time. Thank you, counsel. Good morning, Your Honors. William Thompson on behalf of defendants and appellees, John Sorenson and Tim Paulson. Excuse me. Will you speak directly to the microphone so those in the audience can hear you? Certainly, Your Honor. Thank you. Thank you. May it please the Court. Stripped of labels and conclusions, all the DL has alleged is that over the course of approximately 6 months in early 2012, North American, or N.A. as we call it, conducted an audit of possible overbilling by DL and two other mobile X-ray lab vendors. Forgive me for interrupting, counsel. Was an audit ever produced? There were reconciliation documents that were both provided to DL at the conclusion of the contract. Yes, Your Honor. Well, counsel, I didn't see anything that looked like an audit. And I don't want to take a lot of your time, but if you could give me the ER sites where you think I can find what you're referring to as an audit, that would be helpful to me. I'm afraid I don't have available the document. The fact of the reconciliation letters is referenced in the complaint. I don't know that the documents are attached, although actually, anyway, okay. So that, and just calling something a shakedown scheme over and over again doesn't make it so. Contracting parties are permitted to object to the way a contract has been interpreted and applied, and without transforming the disagreement into fraud. Both sides were permitted to terminate the contracts on two months' notice, which is what N.A. did. If this case were sufficient to plead RICO, it would take the breadth of an already broad statute to new and untenable expanse. The Court should affirm the decision below. The court below didn't apply a bright-line test, even though DL did not, in fact, ask the district court to apply the factors that now, on appeal, it claims the court should have applied, apparently, sua sponte. But Judge Staton specifically noted that she was not applying a bright-line test, and she cited All Waste for that proposition. Moreover, whether or not there's a bright-line test in the Ninth Circuit, it doesn't appear that any Ninth Circuit decision since H-Day has approved a finding of continuity where the scheme lasted, where the scheme, in fact, lasted less than a year. All Waste, for example, addresses a scheme that was alleged to last 13 months. The same is true of the Tycor decision. Ginsburg. Well, Counsel, Condeke urges us to adopt a multi-factor approach to determine closed-end continuity. Is there any reason why we should not? As you have pointed out, there is no Ninth Circuit case. There was a district court case. But what is wrong with a multi-factor test? Your Honor, I think that's what, in fact, the circuit is applying. I believe that's what Judge Staton applied as well. She focused on, quote, the nature of the allegations. And the cases that speak expressly about a multi-factor test talk about the — taking account of the totality of the circumstances, which is exactly what Judge Staton did. She very carefully walked through the allegations of what the — what the scheme alleged actually was. And it wasn't simply — it's clearly not enough simply to call it a shakedown. There are about four elements in the scheme as alleged. And these are memorialized in the appellant's opening brief at pages 6 through 7, where they concede the scheme is a very specific one. First, that there was an audit conducted of the vendors that whether it was — they claim it was in a good faith, whatever that means. But in any event, an audit was done. At that point, credits or refunds were demanded while payments were withhold — were withheld. At that point, allegedly, the vendors were told that the contract would be terminated unless the dispute was resolved, but implied that if the — the contract would be extended if — if, in fact, the dispute was resolved. And then, finally, based on an allegedly secret prior decision, the vendors were fired regardless of the resolution. It's undisputed that the only allegations in the complaint that even remotely go to this scheme as — as alleged in the complaint and as specified in Judge Staton's order and in appellant's opening brief are the three — the three mobile lab and x-ray vendors during the six — six to seven to eight-month, ten-month period in — in 2012. None of the other vendors are alleged to have undergone this particular scheme. And this is the wrongful scheme. Obviously, there's nothing wrongful about, much less a RICO violation, with seeking better pricing from one's vendors. I think that you're — you're right, that there are allegations that were raised in the motion practice that aren't — that don't — I don't see alleged in the complaint. Does that mean that the correct remedy would have been to grant leave to amend? I'm sorry, Your Honor. If you're — It's one thing to say that they can't come back and allege a cause of action on the It seems to me what you're arguing now is that the — if we really limit ourselves to the allegations in the complaint, that they haven't raised what they need to raise to really withstand the — the dispositive motion. And I'm asking whether or not the district court should have granted leave to amend. Well, Your Honor, I don't believe that they asked for leave to amend based on — on that particular ground. And as a matter of fact, the — the allegations regarding the scheme did not change between the first complaint — and this is the — the first amended complaint. They were virtually identical, which I think is partly why the court was able to — to resolve the — the — the motion based on the continuity allegations by themselves, because there were no additional factual allegations that would have extended the scheme as defined. So do you want to answer my question? I'm sorry, Your Honor. That's okay. I wasn't trying to — It wasn't really very well articulated. I think you have a point. There are arguments raised in the motions practice by opposing counsel that — that are — include allegations that really aren't in — on the — on the face of the complaint. We don't see them there. And I'm wondering whether or not the appropriate remedy would have been to grant leave to amend. Well, I don't — if — if the allegations to which Your Honor is referring is the notion that there was a — that there — well, the scheme did change in certain ways. There was — originally, it was conceded, it was alleged directly that there was an audit in the other two — two mobile lab and x-ray vendors. In the — in the first amendment complaint, that has changed to know there was no audit done, even though they'd already gone to trial in Delaware and gotten an injunction against Bobby Seward based on the audit that they — that they asserted had been — had been done. And then in — in the motion practice, they switched again to the notion that, well, there was an audit, but it wasn't a good-faith audit. It was a legitimate audit, even though the — the first amendment complaint didn't use those terms at all. I don't believe they ever asked leave to amend to formally change the first amendment complaint or to file a second amendment complaint that would have reflected that change in theory. So you're not arguing that they would have had to request leave to amend, I'm sure. It sounds like you're arguing that future amendment would have been futile. It would have been futile, yes, Your Honor. In — in the papers, appellants make much of the notion that — that Judge Steyden included in the closed-ended analysis — closed-ended continuity analysis the notion that there was no indication, no properly pleaded allegation that the scheme would have continued, or that it did continue, and that she took notice of the fact that there was a three-year gap between the last of the — the acts properly — arguably properly alleged under the scheme as — as alleged and the filing of the complaint. I would like to point out that in Turner v. Cook, this Court did the same thing. This — this Court, in Turner v. Cook, looked to, quote, the threat of future criminal conduct as part of the closed-end continuity analysis. Judge Steyden did nothing — nothing different. She didn't contend that it was the only consideration, but it was an important consideration, just as it is with — with considering the — the open-ended continuity test as well. The scheme, as alleged, had a clearly built-in termination point. It — it addressed three vendors who were told, if — if you don't — if we don't reach an agreement, we will — we will terminate the contracts. That was done. There were reconciliation letters sent. In some cases, checks were — were mailed to — to the vendors. And there's nothing about that scheme that — that inherently projects, you know, indefinitely into the future, which is the — the term — the term of phrase that H.J. uses. Similarly, there's — there's no indication that this was their way of doing business. The complaint makes clear that these were parties that had contracted together for years before, and that — that N.A. continued in business for years afterwards. And again, it's a very short period of time in which there are any allegations that even colorably show mail-or-wire fraud. Judge Staton found — did not find, as a matter of fact, that they — that they properly pleaded those — those predicate acts. But for the sake of argument, she — she credited those — those pleadings. If — may I ask one more question? I see time's up, but may I ask one more? Sure. Counsel, what about this language, total so far? This is the total so far. How should we interpret that? This is from an internal spreadsheet that refers only to mobile X-ray and lab vendors who are the — the three vendors at — at issue here. It may have been Mr. Seward's — his hopes, but those — those were the only three vendors which are the three at issue in — in this case. And why can't that be construed to mean that — that retrospective audits were going to be done as to those three vendors? Well, I don't believe the spreadsheet refers to audits. It refers to savings identified. Well, that's certainly your — your perspective. But opposing counsel's got the — I just want you to, if you would, respond to his argument. Sure. Well, two things. First of all, it is an internal document. It's not something that was shared with — with anyone else. Second, the complaint is full of allegations of — of dealings with — with other vendors after the period, none of which have any indication that there's any kind of misrepresentation to be made to any of the vendors. They're simply pursuing better pricing, as is — as is the right and as most consumers do as well. Thank you, counsel. Thank you, Your Honor. Counsel stated that there had never been a case that has found continuity in a first scheme that lasted less than 10 months. That ignores California architectural, which this Court described in Always at page 1529 as having found continuity requirements satisfied with predicate acts that span five months. Right. That wasn't really a continuity case. Excuse me. It was not a true continuity case because it predated the Supreme Court's definition of closed-end continuity. True. But I think what Always recognizes is that California architectural, as well as Sun Savings, were consistent with age-sharing. Perhaps. I'm just saying it wasn't a continuity case. Well, the Court rejected the multiple scheme requirement, certainly. But when it said there were multiple representations made to multiple victims over a period of five months, it was finding a pattern. And I — and as — as Always held, that was continuity finding. At least that's the way I believe Always should be read. Your Honor asked about leave to amend. We did ask for leave to amend in the district court. This is at SCR 33 and at SCR 11. I believe the allegations certainly are consistent — I mean, sufficient. More than sufficient to establish a scheme under either test. But if the Court feels otherwise, leave — certainly leave to amend should be granted. And I do believe — How would you — how would you amend? Well, among other things, we've identified in our — in the opposition to the motion to dismiss allegations we'd make regarding the audits. There'd be further allegations regarding obstructing justice, for example. Opposing counsel says the allegations of audits came and went and that you conceded that an audit had been performed. Is that right? No, that's not true at all. In the — in the original complaint, we alleged that any audit that was done was a sham. And that's at pages 26 and 27 of our original complaint. I don't have the ER site handy. And — and then in the current complaint, the amended complaint, we alleged that no audit had been done. And the basis for that allegation is, as alleged in paragraph 352 of the amended complaint, they didn't follow any audit standards. You know, to have an audit, you have to review the records. Seward admitted he didn't even have the contracts until after he'd purportedly done the audit. And as Your Honor noted, they have never produced any of the audit documents. That's alleged in paragraph 352. And — and we have asked for them in discovery and the related actions. They've never produced them. They've never been able to explain what the audit procedures that were done. So we think our allegations on that point, as well as all the others, are more than sufficient. And I don't believe we're relying on anything in our briefs in this Court, in anything I've said this morning, that's not in the complaint. But if the Court were to conclude otherwise, certainly we believe that leave to amend should be granted. Thank you, Counsel. Thank you. The case just argued will be submitted for decision. Thank you both for your arguments today.
judges: D.W. Nelson, Thomas, Christen